**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **JAMES CALHOUN COLGAN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-cv-740 (TSC) |
| | ) | |
| **DEPARTMENT OF JUSTICE** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff James Calhoun Colgan has sued the U.S. Department of Justice ("DOJ") seeking to compel disclosure of information responsive to his Freedom of Information Act ("FOIA") request to the FBI. Pending before the court are four motions: DOJ's motions for partial summary judgment and summary judgment under Federal Rule of Civil Procedure 56, (ECF No. 17 ("Def. First Mot."), ECF No. 38 ("Def. Second Mot.")), and Colgan's cross-motions for summary judgment, (ECF No. 22 ("Pl. First Cross-Mot."), ECF No. 42 ("Pl. Second Cross-Mot.")).

For the reasons set forth below, the court will GRANT in part and DENY in part Defendant's Motion for Partial Summary Judgment (ECF No. 17), GRANT in part and DENY in part Plaintiff's Cross-Motion for Summary Judgment (ECF No. 22), DENY Defendant's Motion for Summary Judgment (ECF No. 38), and DENY Plaintiff's Motion for Summary Judgment (ECF No. 42).

# I.    BACKGROUND

Colgan is a researcher and freelance investigative reporter.  (ECF No. 1 ("Compl.") ¶ 2.)
On February 26, 2014, he submitted a FOIA request to the FBI seeking a variety of documents
about the FBI's FOIA procedures.  (*Id.* ¶ 12.)  The request contained 30 subparts:

1)    A complete and unredacted copy of the latest and all previous version[s] of the FBI's Freedom of Information and Privacy Acts Reference Manual (known as the "Green Book"), including all updates and numbered memos.  Please conduct a new review to determine which portions of the Green Book may be released; disclosure of a previously processed version of the Green Book produced to a different FOIA requester will not satisfy this request.

2)    Documents referring or relating to the classification or declassification of any version of the Green Book.

3)    The FBI Foreign Government Information Classification Guide ("G-1 Guide"); the FBI National Security Information Security Classification Guide; the FBI Vulnerability Assessment Security Classification Guide; the FBI Security. Division Continuity of Operations Security Classification Guide; the FBI Information Assurance Section Guide; the FBI Technical Surveillance Countermeasures Security Classification Guide; and the FBI Automatic Declassification Guide[.]

4)    Every issue of RIDS FOIA Buzz and any other FOIA-related newsletter created by the FBI.

5)    All records constituting, referring, or relating to the "Fee Coordinator List" or "Fee Coordinating List." This request includes, but is not limited to, the list itself at monthly intervals over the past five years; for the past five years, all bi-weekly emails sent in reference to individuals on the list; and all Fee Coordinator/Coordinating List spreadsheets at monthly intervals for the past five years.

6)    All manuals, policies, and training material referring or relating to full-text searching of ECF.

7)    Any records listing, in whole or in part, or discussing, which FBI systems of records have been made obsolete or are no longer used.

8)    A blank or sample copy of any form, whether paper or electronic, that is or may be used by FBI employees or contractors in the process of searching, perfecting, reviewing, redacting, processing, or otherwise handling a FOIA or Privacy Act request submitted to the FBI, including a blank copy of any form used to evaluate the performance of employees or

contractors. The term "form" is intended to include, but not be limited to, portions of form letters known as "pitches."

9)      For each of the following systems of records in the following list, provide (1) a screenshot / printout of any computer search screen (meaning a screen from which an individual may input search terms to search one or more system of records) that can be used to search one or more of the following systems of records; and (2) any manuals, policies, or training materials referring or relating to any of the following systems of records: Central Records System (CRS); ELSUR (both Headquarters and Field Office); Bureau Mailing List; Infragard; Bureaupedia, Intellipedia, and any wiki to which the FBI has access; InteLink-U, -S, -TS, -P, and -C; Next Generation Digital Collection System 5000 (NG DCS-5000) and any other Title 50 collection systems; any Title III Criminal Law Enforcement (collection systems); any shared drives (such as I: drive); Document Conversion Laboratory; Financial Management System; CORE; PRISM; BLARNEY; Upstream; Fairview; NCIC files; National Information Sharing Strategy (NISS) and its components: Law Enforcement Online (LEO), Law Enforcement National Data Exchange (NDEx), and OneDOJ; the FBI's Records/Information Dissemination Section (RIDS) Work Process Unit (WPU) SharePoint sites any other SharePoint sites available to the FBI; eChirp; Subject Matter Expert (SME) pages; NCTC Online; FBI Top Secret/Sensitive Compartmented Information Operational Network (SCION); FBI Data Integration and Visualization System (DIVS); Delta; FISAMS; DWS/EDMS; Data Loading and Analysis System (DaLAS); Telephone Application; Clearwater; Investigative Data Warehouse; Guardian/eGuardian; Sentinel; Accurint; Threat Matrix; Automated Case Support (ACS) Universal Index; ACS Electronic Case File (ECF); and ACS Investigative Case Management.

10)      Any contract or other agreement, contract award, contract proposal, or request for proposal relating to FOIA or Privacy Act work, including but not limited to processing of FOIA or Privacy Act requests and development of software for processing of FOIA or Privacy Act requests.

11)      Any policy, training material, or guidance as to how to compute an estimated date of completion for a FOIA requester.

12)      Curriculum, training material, PowerPoint slides, or other documents relating to, presented, or distributed at the FBI's formal training programs on search skills, declassification, FOIA processing, and FOIA litigation.

13)      Curriculum, training material, PowerPoint slides, or other documents relating to, presented, or distributed at the FBI's FOIA processing class for new FOIA specialists as well as any refresher class for FOIA processing teams.

14)      Copy of the twenty oldest still-pending FOIA requests.

15)   For the period beginning June 8, 2012, all records in which requesters asked for an estimated date of completion and all FBI responses to those requests[.]

16)   FBI FOIA logs beginning in 2009.

17)   Any policy, training material, or guidance as to how the FBI determines what documents to place on its electronic reading room, The Vault.

18)   The FBI's list of documents on "special locate" status, and any records disclosing the number of documents on "special locate" status.

19)   Any document constituting, referring, or relating to requests by FBI to Congress for additional funding for processing Freedom of Information Act requests.

20)   Any policy, training material, standard operating procedure, PowerPoint slide, or guidance referring or relating to the FBI's practice or process of "blackballing" files.

21)   Any training material used at the FBI's Quantico training facility, the National Executive Institute, Law Enforcement Executive Development Seminar (LEEDS), International Law Enforcement Academy, or the FBI's Virtual Academy which discusses or mentions FOIA or the Privacy Act.

22)   Any document listing or describing the types of records that can be located through a search of the Central Records System. (For example, any documents showing that a search of the CRS would locate records contained in Guardian.)

23)   Any document referring, relating to, mentioning, discussing, or implementing abandonment of the "field office rule," 28 CFR 16.3(a) and 16.4(a), following the Attorney General's new processing guidelines in 2009.

24)   Any document mentioning, referring, or relating to the practice of "diverting" or reassigning RIDS FOIA staff to non-FOIA work, including policies and statistics reflecting or pertaining to this practice.

25)   Any records explaining or defining the following types of files, or providing the history of the FBI's use of the type of file, or mentioning or discussing whether the types of files are still used by the FBI: "See Also" files; "Do Not File" files; "Official & Confidential" files; numbered and lettered subfiles; 1A envelopes; enclosures behind files (EBF's); "Personal & Confidential" files; ticklers; restricted files; "JUNE" files; "Obscene" Files; "Subversive" Indexes; and Bulky Exhibits.

26)   Any records explaining what is meant by the "Special File Room"; the circumstances under which files are placed in the "Special File Room";

4

any list of documents located in the "Special File Room"; and any guidance or direction regarding when the "Special File Room" should be searched in response to a FOIA request.

27)     Records referring or relating to Sunshine Week, a national initiative to promote open government. Your search should include, but not be limited to, emails and other correspondence to or from David Hardy, David Sabonya, and Dennis Argall.

28)     Records referring or relating to the Rosemary Award, an annual "honor" awarded by the National Security Archive for worst "open government" performance. Your search should include, but not be limited to, emails and other correspondence to or from David Hardy, David Sabonya, and Dennis Argall.

29)     Records referring or relating to the website www.getmyfbifile.com

30)     Records referring or relating to MuckRock or the website www.muckrock.com, except for correspondence with FOIA requesters.

(Compl. ¶ 12.)

The FBI sent Colgan a letter on April 3, 2014, informing him that it had found no records responsive to twelve of his requests; it did not address the other eighteen. (*Id.* ¶¶ 15–16.) After Colgan filed his complaint in this case on April 14, 2014, the FBI conducted additional searches, processed over 7,100 pages, and produced over 6,400 pages. (ECF No. 64-1 ("Sixth Hardy Decl.") ¶ 10.) While processing these documents, the FBI moved for partial summary judgment on the adequacy of its searches. After Colgan filed his opposition to the FBI's motion, the agency conducted more searches, processing another 1,582 pages and releasing all but seven. (Sixth Hardy Decl. ¶ 12.)

The FBI and Colgan then agreed to test the FBI's exemption claims using sampling. (Sixth Hardy Decl. ¶ 11.) Colgan selected a sample of 450 pages from the thousands of pages processed and withheld, and the FBI created a *Vaughn* index for those pages. (*Id.* ¶ 11.) In reviewing that sample to create the *Vaughn* index, the FBI released 272 pages in full and 155 pages in part to Colgan. (*Id.* ¶ 15.) After releasing the pages from the sample, the FBI again

reviewed all withheld pages, and "made changes on 1,915 pages, 1,745 of which were re-released" to Colgan.  (*Id.* ¶ 14.)

## II.    LEGAL STANDARD

"FOIA provides a 'statutory right of public access to documents and records' held by federal government agencies." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*, 602 F. Supp. 2d 121, 123 (D.D.C. 2009) (quoting *Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir. 1982)).  The Act requires that federal agencies comply with requests to make their records available to the public, unless such "information is exempted under [one of nine] clearly delineated statutory [exemptions]." *Id.* (internal quotation marks omitted); *see also* 5 U.S.C. §§ 552(a)–(b).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Georgacarakos v. FBI*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012) (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)).  Summary judgment in FOIA cases may be based solely on information provided in an agency's supporting affidavits or declarations if they are "relatively detailed and nonconclusory." *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)).  These declarations are "accorded a presumption of good faith which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Id.*

"To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with specific facts demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld . . . records." *Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (citing *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)) (quotation marks omitted).  By corollary, "[a] non-moving party's

complete failure to come forward with evidence to demonstrate the existence of a genuine issue

of material fact constitutes a reason for the grant of summary judgment under [Rule 56(e)]."

*Smith v. U.S. Dep't of Justice*, 987 F. Supp. 2d 43, 47 (D.D.C. 2013).

Summary judgment is proper where the record shows there is no genuine issue of

material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia*, 298

F.3d 989, 991 (D.C. Cir. 2002).  Courts must view "the evidence in the light most favorable to

the non-movant," "draw[ ] all reasonable inferences accordingly," and determine whether a

"reasonable jury could reach a verdict" in the non-movant's favor.  *Lopez v. Council on Am.–*

*Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).

## III.    ANALYSIS

### A.  <u>FBI's Searches</u>

An agency responding to a FOIA request must make "a good faith effort to conduct a

search for the requested records, using methods which can be reasonably expected to produce the

information requested."  *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318

(D.C. Cir. 2006).  An agency will be granted summary judgment on the adequacy of its search if

it "show[s] beyond material doubt [ ] that it has conducted a search reasonably calculated to

uncover all relevant documents."  *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting

*Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983) (*Weisberg II*)).

An agency can show "reasonableness" by "setting forth the search terms and the type of

search performed, and averring that all files likely to contain responsive materials (if such

records exist) were searched."  *Sanders v. Obama*, 729 F. Supp. 2d 148, 155 (D.D.C. 2010), *aff'd*

*sub nom.*, *Sanders v. U.S. Dep't of Justice*, No. 10–5273, 2011 WL 1769099 (D.C. Cir. Apr. 21,

2011) (internal citation omitted).   "The question is not 'whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*.'" *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (emphasis in original) (quoting *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (*Weisberg III*)).   Adequacy "is judged by a standard of reasonableness and depends, not surprisingly, on the facts of each case." *Weisberg III*, 745 F.2d at 1485.   An agency need not search every record system; a search may be reasonable if it includes all systems "that are likely to turn up the information requested." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).   "Once an agency has made a prima facie showing of adequacy, the burden shifts to the plaintiff to provide countervailing evidence . . . sufficient to raise substantial doubt concerning the adequacy of the agency's search." *Rodriguez v. U.S. Dep't of Def.*, 236 F. Supp. 3d 26, 35 (D.D.C. 2017) (internal citation omitted).   Speculation that additional records exist is not grounds to require a further search. *Kowalczyk*, 73 F.3d at 388.   Courts are mindful, however, that "congressional intent tilt[s] the scale in favor of disclosure." *Morley*, 508 F.3d at 1114 (internal citation omitted).

Colgan challenges the FBI's searches for thirteen of his thirty requests.[1]   In support of the adequacy of its searches, the FBI submitted two declarations from David M. Hardy, the Section Chief of the Record/Information Dissemination Section ("RIDS") of the Records and Management Division of the FBI.   (ECF No. 17-1 ("Second Hardy Decl.") ¶ 1, ECF No. 30-1 ("Third Hardy Decl.").)   The declarations describe the FBI's process for searching for responsive documents in two main systems, the Central Records System ("CRS") and the FOIPA Document

---

[1] Colgan does not contest the adequacy of the FBI's searches for request numbers 2–4, 6, 7, 10–18, 26, 29, and 30.   (ECF No. 33 ("Pl. Reply") at 2, 5; ECF No. 26.)

Processing System ("FDPS"), a repository of its prior responses to FOIA requests.  (Second Hardy Decl. ¶¶ 7–15.)

1.  Failure to Search (Request Nos. 8, 22)

The FBI did not search for records in response to Colgan's eighth and twenty-second requests.  In response to the eighth request, rather conducting a search, the FBI gathered 360 pages based on Hardy's "institutional knowledge and position within RIDS" which made him "familiar with the forms used by RIDS."  (Second Hardy Decl. ¶ 22.)  This was inadequate.  Reliance on an individual's knowledge of records does not fulfill an agency's obligation to search for responsive records.  *Defenders of Wildlife v. U.S. Dep't of Agriculture*, 311 F. Supp. 2d 44, 55 (D.D.C. 2004) ("[T]he bare assertion that the Deputy Under Secretary saw the FOIA request and that he stated that he had no responsive documents is inadequate because it does not indicate that he performed any search at all.").  This is because agency affidavits that "do not denote which files were searched or by whom, do not reflect any systematic approach to document location, and do not provide information specific enough to enable [the requester] to challenge the procedures utilized" are insufficient.  *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 371 (D.C. Cir. 1980) (*Weisberg I*); *see also Steinberg*, 23 F.3d at 551–552.  Similarly, in response to Colgan's twenty-second request, the FBI "referred plaintiff to a Federal Register internet link, since it interpreted the request as seeking information about the FBI's CRS and that public[ly] available system notice provides information about the types of records therein." (Third Hardy Decl. ¶ 31.)  The FBI maintains that Colgan's request "does not lend itself to a traditional search of the CRS the FBI routinely performs in response to most FOIA requests for investigative records" and therefore "no search of the CRS was performed."  (*Id.*)  But an agency's FOIA duties are not limited to the "traditional" or "routine" procedures it uses to respond to FOIA requests.  The FBI must engage in a search reasonably calculated to discover

and release responsive records.  *See Oglesby*, 920 F.2d at 68.  Its decisions not to conduct

searches for the eighth and twenty-second requests were inadequate to discharge its duty under

FOIA.

2. <u>Failure to Search Places Likely to Contain Responsive Materials (Request Nos. 5, 19, 23–25, 27 & 28)</u>

To conduct an adequate search, an agency must also "aver[] that all files likely to contain

responsive materials (if such records exist) were searched."  *Sanders*, 729 F. Supp. 2d at 155

(internal citation omitted).  The FBI has not done so here.

*i.     Limiting the Search to CRS and FDPS*

The FBI offers a paltry justification for limiting its search to CRS and FDPS in the first

instance.  Hardy's declaration asserts, for all thirty requests, that searching additional locations

would not result in responsive records: "Given the nature of plaintiff's 30-part request and the

comprehensive nature of the information contained in the CRS, the CRS is the only FBI system

of records where responsive records would reasonably be found."  (Second Hardy Decl. ¶ 33.)

This conclusory statement that the FBI searched all places likely to have responsive records for

all requests cannot support the implication that CRS is the only location in which responsive

records are likely to be found.  *See Wallick v. Agric. Mktg. Serv.*, 281 F. Supp. 3d 56, 73 (D.D.C.

2017) (holding an agency did not sufficiently show no other locations were likely to have

responsive documents where the agency "conclusorily assert[ed]" that the searched places were

the only ones likely to have responsive records) (citing *Morley*, 508 F.3d at 1116).

Indeed, it would be difficult for the FBI to satisfy its burden in one paragraph, given the

varied nature of the FOIA requests.  That difficulty is highlighted in the Hardy Declaration's

internal inconsistency: the FBI first states that CRS is the "only" system where responsive

records could be found, and in the next sentence states that it searched other locations including

"FDPS, targeted searches of specific offices/internal websites, and Virtual Academy." (Second Hardy Decl. ¶ 33.)  In addition, in response to other Colgan requests, the FBI later declared that it searched other locations not listed in this paragraph.  For example, in response to the nineteenth request, the FBI also searched the Office of Congressional Affairs, indicating that CRS is not the only place likely to have responsive records.  Therefore, the Second Hardy Declaration is conclusory and inconsistent, and fails to meet the FBI's burden to show no other locations were likely to have records responsive to all thirty requests.

      *ii.*     *Failure to Explain the Places Searched*

The FBI's declaration also lacked sufficient explanation for why it searched certain locations for responsive records.  For example, in response to Colgan's twenty-fifth request for records explaining certain file types, the FBI searched the following offices, websites, and manuals: Records Policy Administration Section Homepage – Records Management Manual, Internet – Policies Homepage, Evidence Manual, File Services Unit– Vintage Manual, Filing Unit Guide, FBI Records Retention Plan Part 2, Secure & Interpret your FBI Files – booklet, MAOP Index – Vault, and MIOG Index – Vault. (Third Hardy Decl. ¶ 39.)  The search resulted in 42 pages of responsive records. (*Id.*)  The FBI does not reasonably detail why these places were searched, why they were likely to contain responsive records, or what search terms were used. *See Oglesby*, 920 F.2d at 68.

      *iii.*     *Rejecting Suggested Searches*

Furthermore, for numerous requests, the FBI did not explain why it searched the places it did and rejected searches Colgan suggested.  While the FBI "need not knock down every search design advanced by every requester," *DiBacco v. U.S. Dep't of the Army*, 795 F.3d 178, 191 (D.C. Cir. 2015) (*DiBacco I*), Colgan's suggestions were often reasonable, and the FBI otherwise fails to show that it searched all places likely to have responsive records.

For example, in response to the nineteenth, twenty-fourth, and twenty-fifth requests, the FBI did not explain adequately why it limited the scope of its search to CRS or FDPS and did not search the sites Colgan suggests were likely to contain responsive documents. *See Oglesby*, 920 F.2d at 68 (explaining that the agency "was required to explain in its affidavit that no other record system was likely to produce responsive documents"). Colgan suggests that for budget-related records, responsive records might be found within the Budget Formulation and Presentation Unit, the Accounting and Budget Analysis Unit, and the Records Management Division's Financial Services Unit. (Pl. First Cross-Mot. at 17.) And for records about diversion of FOIA staff, the FBI could have consulted with human resources. (*Id.* at 23.)

In addition, Colgan's twenty-seventh request and twenty-eighth requests suggest searching certain emails that might contain responsive records. The FBI explains it did not search those emails because "any pertinent records in the form of email or 'correspondence,' if created and indexed to a CRS file, would have been located via the CRS search, but no CRS records were found here. Separate email searches would be redundant[.]" (Third Hardy Decl. ¶ 44.) While an agency need not search every record system in response to a FOIA request, it also "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby*, 920 F.2d at 68. The FBI declares that no additional searches were needed because it searched CRS, but the agency does not explain how a CRS search would be reasonably likely to turn up the documents requested. Further, the FBI responds that it did not search the email records Colgan identified because CRS would have those records "if [they were] created and indexed to a CRS file." (Third Hardy Decl. ¶ 44.) But the FBI does not claim, nor could it, that CRS contains all FBI records and emails. It states that CRS is the FBI's "extensive" record system, containing "applicant, investigative, intelligence, personnel,

administrative, and general files compiled and maintained by the FBI in the course of fulfilling its . . . missions and functions."  (Second Hardy Decl. ¶ 7.)  But this does not show that CRS is the only place that would contain or be likely to contain responsive records.

Further, the FBI did not explain why CRS and FDPS would be the only place likely to have records responsive to Colgan's twenty-third request.  That request seeks records about the field office rule, which required FOIA requesters to seek records directly from those offices.  (Pl. First Cross-Mot. at 21.)  The FBI searched FDPS and CRS using the search term "FBI's practice or process of 'Abandonment of Field Office Rule,'" but did not locate any responsive records.[2] (Third Hardy Decl. ¶ 33.)  Colgan suggests it would be reasonable to assume the FBI communicated the rule change to field offices, and therefore it would be necessary to search systems other than CRS.  (Pl. First Cross-Mot. at 21.)  The FBI responds that "all FBI FOIA/PA policy, procedure, and processing decisions are centrally managed under the purview of RIDS" and "there is no factual basis to conclude responsive records would reside in any field office." (Third Hardy Decl. ¶ 34.)  But Hardy's assertion that field offices are not involved in policy decisions has no bearing on whether the field offices were informed of the rule change and would have responsive documents.  Again, the FBI does not explain why it limited its search to CRS and FDPS, especially given Colgan's suggestion that other systems and field offices would likely have responsive records.  Because the FBI fails to articulate why the places it searched were the only places likely to have responsive records, especially given some of the requests

---

[2] Colgan points to external documents regarding the field office rule that the FBI failed to locate. (*See* Pl. First Cross-Mot. at 21, Ex. 17 ¶ 6.)  While an adequate search can miss responsive records, *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003), Colgan makes an initial showing that responsive records may exist; and, rather than assuaging them, the FBI's remaining arguments raise substantial doubts about the adequacy of its search.

directed the agency to other likely locations, it has not shown that its search was adequate.  *See Mobley v. CIA*, 806 F.3d 568, 582 (D.C. Cir. 2015) (noting that generally "an agency may not ignore a request to search specific record systems when a request reaches the agency before it has completed its search" (citing *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998))); *Oglesby*, 920 F.2d at 68.

    iv.  *Failure to Follow Clear Lead*

   The FBI's search was also inadequate because it failed to follow clear leads.  In response to Colgan's fifth request, the FBI searched FDPS and identified a previously processed request regarding the same subject, a two-page "fee coordinating list," which it produced.  (Third Hardy Decl. ¶ 11.)  It later searched CRS and its training materials and found the same two pages.  (*Id.*)  Colgan argues that the FBI's search was inadequate because the document produced states exactly where the FBI maintains the Fee Coordinator list: "the Fee Coordinator list is maintained on the WPU SharePoint site."  (ECF No. 33-5 at 1.)  But the FBI did not search the WPU SharePoint site.  (Third Hardy Decl. ¶ 11.)  Although an agency is entitled to limit its search to locations most likely to contain responsive documents, it may not ignore "positive indications of overlooked materials."  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999); *see also DiBacco v. U.S. Dep't of the Army*, 926 F.3d 827, 833–34 (D.C. Cir. 2019) (*DiBacco II*) ("[T]he agency need pursue only a lead it cannot in good faith ignore, *i.e.*, a lead that is both clear and certain." (quoting *Kowalczyk v. U.S. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996))).

   Here, the FBI ignored a "positive indication"—in the only responsive record found—that records related to the request were likely to be found in the WPU SharePoint site.  *See Valencia-Lucena*, 180 F.3d at 326.  The FBI offers no justification for ignoring this lead.  And, as discussed above, the FBI's conclusory statement that it searched all likely places (Second Hardy

Decl. ¶ 33) fails to overcome the "positive indication" in the record that responsive documents would be found elsewhere.  The FBI's failure to search the system identified in its record as the place where the requested documents might be located or explain why it did not search the location renders its search inadequate.  *See Valencia-Lucena*, 180 F.3d at 327 ("[I]f an agency has reason to know that certain places may contain responsive documents, it is obligated under FOIA to search barring an undue burden.")

3.  Inadequate Descriptions of Search Terms and Type of Search Performed (Request Nos. 1, 19, & 21)

An agency can show that its search was reasonable by "setting forth the search terms and the type of search performed[.]"  *Sanders*, 729 F. Supp. 2d at 155 (internal citation omitted).  For Colgan's first, nineteenth and twenty-first requests, the FBI's responses lacked enough detail regarding the search terms or type of search performed.

For the nineteenth request, the FBI determined its Office of Congressional Affairs was reasonably likely to have records, but a search of that office found no responsive records.  (Third Hardy Decl. ¶ 22.)  And, in response to the twenty-first request, the FBI contacted the Training Division at Quantico to search for responsive materials at the facility for documents mentioning FOIA or the Privacy Act.  (Second Hardy Decl. ¶ 25.)  That search produced the same record the FBI had already identified from its Virtual Academy.  (Third Hardy Decl. ¶ 28, n.4.)  But the FBI gives no information about the search methods or terms used for the additional searches conducted by the Office of Congressional Affairs or the Training Division at Quantico.  The court therefore cannot conclude that the FBI's search efforts "us[ed] methods which can be reasonably expected to produce the information requested."  *Oglesby*, 920 F.2d at 68.

Further, in response to Colgan's first request, the FBI searched both CRS and FDPS using the search terms "FOIA Green Book" and "Freedom of Information Act Green Book," and

searched CRS alone using the search terms "FOIA Reference Manual" and "Freedom of Information and Privacy Acts Reference Manual."  (Second Hardy Decl. ¶ 14; Third Hardy Decl. ¶ 7.)  While these searches did not yield responsive records, they did identify two FOIA requests from 1982 and 1994 for a "FOIA Reference Manual."  (Second Hardy Decl. at n.5; Third Hardy Decl. ¶ 7.)  It located the administrative file containing the materials processed for those old FOIA requests but did not locate a FOIA reference manual.  (*Id.*)  Hardy does not, however, explain what, if anything, the agency did to search the file.  This is similar to the deficient explanation in *Aguiar v. DEA*, 865 F.3d 730, 739 (D.C. Cir. 2017), in which the DEA identified responsive case files but did not describe its search of them; the agency argued "there was no further 'methodology' to undertake other than to go through those files and see if any records therein were responsive."  *Id.* (internal citation omitted).  The court explained that the "implication" of the statement was that the files were physical documents that were manually examined, but the declaration "d[id] not describe the search in that way."  *Id.*  Therefore, the agency's description was inadequate, and the Court directed it to describe the search of the case files in a new declaration.  *Id.*  Here, the FBI's declaration is similarly deficient because it leaves the court to speculate about the nature of the file (electronic or hard copy) and how it was searched.  *See id.*

   4.   Failure to Explain How Searches Would Be Unduly Burdensome (Request Nos. 9, 19, 20, 23, 24)

   The FBI also contends that searches for several requests would be "unduly burdensome," but fails to establish that burden.  An agency is not required to undertake a search that is so broad as to be unduly burdensome.  *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 892 (D.C. Cir. 1995).  But the agency must "provide sufficient explanation as to why such a search would

be unreasonably burdensome." *Id.* To meet that burden, an agency generally provides a "detailed explanation" of the "time and expense of a proposed search." *Wolf v. CIA*, 569 F. Supp. 2d 1, 9 (D.D.C. 2008); *see also Ayuda, Inc. v. Fed. Trade Comm'n*, 70 F. Supp. 3d 247, 275 (D.D.C. 2014) (holding an agency's affidavits must show with "reasonable specificity" why further segregation of documents, properly withheld under FOIA exemptions, would be unreasonably burdensome).

In response to Colgan's twenty-third request, the FBI merely argues that it would be unduly burdensome to search field offices for relevant documents. (Third Hardy Decl. ¶ 34.) This conclusory statement fails to meet the level of detail required to show a search was reasonable. *Pub. Citizen, Inc. v. U.S. Dep't of Educ.*, 292 F. Supp. 2d 1, 6 (D.D.C. 2003) (rejecting agency's claim that requested search was unreasonably burdensome "[w]ithout more specification as to why a search certain to turn up responsive documents would be unduly burdensome").

The FBI also asserts that Colgan's ninth request, for screenshots or printouts of certain search screens in agency records, would be unduly burdensome because "there is no reasonably practical method of searching for specific screen shots which may exist in record form." (Third Hardy Decl. ¶ 16.) It contends that such a search would require a manual search of "voluminous amounts of records and expend thousands of hours on the possibility that a responsive record of a screenshot or manual was created and exists." (*Id.*) These conclusory statements about the volume of material that would need to reviewed do not provide estimates of the cost of the search, or whether the burden would be unusual, and therefore fail to show that a search would be unduly burdensome. *See Tereshchuk v. Bureau of Prisons*, 67 F. Supp. 3d 441, 455 (D.D.C. 2014), *aff'd*, No. 14-cv-5278, 2015 WL 4072055 (D.C. Cir. June 29, 2015).

Colgan's ninth request also seeks "any manuals, policies, or training materials referring or relating to" certain FBI records systems.  (Compl. ¶ 12(9).) [3]  Hardy states that the search would be unduly burdensome because it would require the FBI to "prepare at least 30 Electronic Communications to the Information Technology Services Division ("ITSD") responsible for each purported system of record, which would be an enormous effort placed on RIDS to prepare, submit, and coordinate with the many ITSDs."  (Second Hardy Decl. ¶ 30(c)(i).)  He goes on to estimate that the "work for Item Number 9, Part 2, could potentially involve tens of thousands of personnel hours."  (*Id.*)  While Hardy provides an estimate of the hours necessary to complete the search, as with the first part of the ninth request, he does not provide enough detail to show why searching for the policies, manuals, and training materials related to these thirty systems would result in those hours, the costs associated with the search, or whether those costs would be unusual.  *See Tereshchuk*, 67 F. Supp. 3d at 455.

Hardy also claims that the search could result in "hundreds of thousands of pages of potentially responsive material."  (Second Hardy Decl. ¶ 30(c).)  This statement carries little weight in the court's determination of whether a search is burdensome because the quantity of responsive records is not a basis on which to deny a FOIA request.  *See Tereshchuk*, 67 F. Supp. 3d at 454–55 ("This Court is skeptical that a FOIA request may be denied based on sheer volume of records requested . . . .  Indeed, the Act puts no restrictions on the quantity of records that may be sought.").

---

[3] It is unclear whether the FBI maintains that the request was too vague and overbroad, because its briefing and declarations are inconsistent.  Hardy's last declaration on the issue stated the request was not too vague to understand.  (Third Hardy Decl. ¶ 19.)  The court agrees, and finds that the ninth request is stated with sufficient detail.  *See Hudgins v. Internal Revenue Serv.*, 620 F. Supp. 19, 21 (D.D.C. 1985).

In addition, Colgan argues that for several requests the FBI should have performed a full-text search of the relevant files, rather than an index search of all of CRS.  (Pl. First Cross-Mot. at 17, 19, 21–23.)  The FBI responds that a full-text search of CRS would be unduly burdensome, arguing that Colgan's suggested terms are "generic" and "would potentially yield enormous amounts of hits with no indicia of responsiveness."  (Third Hardy Decl. ¶¶ 22, 34; *see also id.* ¶ 37.)  Indeed, the FBI avers that a full-text search is "inherently an unduly burdensome task."  (*Id.* ¶ 26.)  It does not, however, respond to Colgan's suggestion that it search targeted files rather than all of CRS.  (*See id.* ¶¶ 22, 26, 34, 37.)  Further, in order to show that a search is unduly burdensome, an agency must proffer reasonably detailed affidavits.  *Wolf*, 569 F. Supp. 2d at 9.  Here, Hardy's conclusory statement that a full-text search would "return a significant number of hits," requiring the FBI to "review each hit to determine whether it pertains to the specific subject of the plaintiff's request" (Third Hardy Decl. ¶ 22) is not reasonably detailed. *Pub. Citizen, Inc. v. U.S. Dep't of Educ.*, 292 F. Supp. 2d at 6.

The FBI also rejected the full-text search suggestion because "RIDS does not routinely conduct text searches in response to FOIA/PA requests."  (Third Hardy Decl. ¶ 34; *see also id.* ¶ 26.)  This reliance on past practice, without further explanation, is an insufficient justification and does not establish that a search would be unduly burdensome.

5.  <u>Maintenance of Systems (Request No. 9)</u>

The FBI contends that it does not maintain some of the systems described in Colgan's ninth request and therefore is not obliged to search for responsive records related to them. (Second Hardy Decl. ¶ 30(b)(i).)  The FBI is correct that an agency's mere "right of access" to a responsive document does not render the document an "agency record" because FOIA applies only to records "which have been *in fact* obtained, and not to records which merely *could have*

19

been obtained." *Forsham v. Harris*, 445 U.S. 169, 185–86 (1980) (emphasis in original). But "all records in an agency's possession, whether created by the agency itself or by other bodies covered by the Act, constitute 'agency records.'" *McGehee v. CIA*, 697 F.2d 1095, 1109 (D.C. Cir. 1983) (emphasis omitted). Therefore, if the FBI possesses manuals, policies, or training materials referring to the systems identified in the request, then, under FOIA, they are FBI records. *Id.*

### 6. Record Retention (Request No. 9)

Colgan also claims that for his ninth request, the FBI must make a screenshot of the search screen for the thirty listed records systems because that search screen itself is an agency record. (Pl. First Cross-Mot. at 8.) He acknowledges that FOIA neither requires agencies to create new records nor to disclose records for which they do not "retain possession or control." *Kissinger v. Reporters Comm.*, 445 U.S. 136, 151–52 (1980). He contends, however, that because the search screen is stored in the computer's random-access memory (RAM), which is the component where data is temporarily stored, it is sufficiently tangible to be an agency record. (Pl. First Cross-Mot. at 8–9.) Colgan cites *Columbia Pictures Indus. v. Bunnell*, 2007 U.S. Dist. LEXIS 46364 (C.D. Cal. May 29, 2007), which held that data stored in RAM constitutes electronically stored information for the purposes of civil discovery. He also emphasizes that he did not ask for the results of a proposed search, which would involve creating a record, but rather a record of the search screen. (Pl. Reply at 7.)

Regardless of whether the FBI search screen is an agency record, the search screen is not retained as a record (except, as noted above, if the FBI already took screenshots and retained them). While a computer stores data in RAM to display a blank search screen during use of the software, that storage is not permanent. As the FBI explains:

> Screenshot[] images of FBI computers['] search systems are not systematically outputted as records the agency stores or maintains unless such an image was captured and placed into an agency record like a manual or training material . . . Once a search is complete and the user logs off, the screenshot, either blank or recording the search results, disappears and the image of the screenshots for the search is not stored in any format.

(Third Hardy Decl. ¶ 17.)  Thus, while data to display the search screen is stored, that temporary storage does not constitute retention of a record.  For the government to produce the requested screenshots, it would have to open the software and create a screenshot, which would not otherwise exist from the last time the agency opened the software to the search screen.  FOIA imposes no such duty on agencies, and the search screen is not simply another "form or format" of an already maintained record.  *Cf. Brown v. Perez*, 835 F.3d 1223, 1237 (10th Cir. 2016) (holding an agency did not need to create screenshots of the menu screen for a scheduling system that did not otherwise exist); *Aguiar v. DEA*, 334 F. Supp. 3d 130, 144 (D.D.C. 2018) ("FOIA does not obligate the agency to create new map images using the GPS coordinate data.").  Thus, the FBI need not make new screenshots and produce them.  *See Brown*, 835 F.3d at 1237.

## B. **The FBI's Invocation of Exemptions**

DOJ also moves for summary judgment on the ground that the FBI properly withheld documents under various exemptions.  To justify the claimed exemptions, DOJ submitted four more declarations from Hardy.  (ECF No. 38-1, ECF No. 46-1, ECF No. 51-1, and Sixth Hardy Decl.)  Colgan cross-moves for summary judgment, arguing that DOJ did not meet its burden to justify withholding documents; in the alternative, he seeks *in camera* review of the remaining documents withheld.

A district court may conduct a *de novo* review of the government's decision to withhold requested documents under any of FOIA's specific statutory exemptions.  *See* 5 U.S.C. § 552(a)(4)(B).  The burden is on the agency to show that nondisclosed, requested material falls

within a stated exemption.  *See Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429,

1433 (D.C. Cir. 1992) (citing 5 U.S.C. § 552(a)(4)(B)).

The parties agreed to use representative sampling of 450 pages to test the FBI's

exemption claims.  While creating the *Vaughn* index, the FBI released 272 pages in full and 155

pages in part.  (Sixth Hardy Decl. ¶ 15.)  Because of the large number of pages ultimately

released from the sample, the court ordered the parties to calculate the error rate—that is, how

many pages within the 450-page sample were initially withheld and then released.  (ECF No. 60

(citing *Bonner v. U.S. Dep't of State*, 928 F.2d 1148 (D.C. Cir. 1991) and *Meeropol v. Meese*,

790 F.2d 942 (D.C. Cir. 1986).)  The government ignored this instruction and argued that any

error was remedied because it re-processed the remaining the documents.  (ECF No. 64 ("Def.

Supp. Br.") at 3–4.)  Colgan calculated an error rate of at least 64.2%.[4]  (ECF No. 65 ("Pl. Supp.

Br.") at 3.)  Because the government did not provide its calculation and Colgan's calculation

appears accurate based on the number of pages the FBI declares were released after initially

being withheld, the court accepts that the error rate is approximately 64%.  That is, the FBI

improperly withheld nearly two-thirds of the sampled pages.  This does not bode well for the

accuracy of the FBI's processing of the non-sample documents.

When an agency uses sampling in a FOIA case, the documents in the sample "count not

simply for themselves, but for presumably similar non-sample documents still withheld."

*Bonner*, 928 F.2d at 1152.  In *Bonner*, the State Department and the plaintiff used a sample of 63

_____

[4] According to Colgan, the government released additional information on 289 pages of the 450-page sample (Pl. Supp. Br at 3); this is consistent with Hardy's declaration that the FBI released 272 pages in full and 155 pages in part.  (Sixth Hardy Decl. ¶ 15.)  Because the error rate is well beyond the 25% rate found unacceptable in *Meeropol*, 790 F.2d at 960, the discrepancy between 289 and 272 pages released is of little importance, and likely due to the additional 155 pages released in part.

documents, and the State Department released 19 of those documents without accounting for the original withholding. *Id.* at 1150. The district court did not review the 19 released documents, determining that once they were released it did not have authority to review the agency's original basis for withholding the documents. *Id.* The D.C. Circuit disagreed, given the important role that the 19 documents played as part of the sample. It explained that sampling permits a court "with some confidence" to "extrapolate its conclusions from the representative sample to the larger group of withheld materials." *Id.* at 1151 (quoting *Fensterwald v. CIA*, 443 F. Supp. 667, 669 (D.D.C. 1977) (internal quotation marks omitted)). Therefore, it reasoned, sampling "will yield satisfactory results only if the sample employed is sufficiently representative, and if the documents in the sample are treated in a consistent manner." *Id.* Consequently, while releasing documents initially withheld is not necessarily evidence of bad faith, "doubt may nonetheless be cast on the agency's original exemption claim when the information in question is found releasable within two years after it is withheld." *Id.* at 1152. Because the 19 released documents were part of the representative sample, the D.C. Circuit held that the court must determine whether the redactions on the released documents were proper. *Id.* It held that the *Vaughn* index "for fully but recently released documents that are part of a representative sample, should explain why the once withheld portions were excised at the time of the agency's initial review." *Id.* at 1153.

*Bonner* expanded on the D.C. Circuit's analysis in *Meeropol v. Meese*, 790 F.2d 942 (D.C. Cir. 1986), in which the FBI released 19 pages from a 75-page sample, applying the same standard "in effect at the time the original withholding decision had been made." *Id.* at 960 (emphasis removed). The Court found that the error rate of 25%, when coupled with the FBI's "intransigen[ce]" was "unacceptably high." *Id.* It explained that the high error rate suggested

"that many of the documents processed in 1975 were improperly withheld" and that the "documents inventoried in 1975 have never been appropriately processed." *Id.* On this basis, the Court held that the FBI must reprocess the other withheld records using the correct "operative standards for disclosure." *Id.*

Here, the administrative record supporting this FOIA dispute leaves much to be desired. While the court acknowledges that the FBI was faced with an extensive, multi-part FOIA request, that does not excuse the myriad failures and outright refusals to adequately respond to the request. Indeed, the FBI released 1,582 pages after moving for summary judgment on the adequacy of its searches and released nearly two-thirds of its sampled documents. At bottom, the extraordinary error rate casts "substantial doubt" on the FBI's original claimed exemptions.

The FBI argues that because it already re-processed the non-sample pages, any harm has been ameliorated. (Def. Supp. Br. at 3–4.) While the FBI is correct that *Meeropol* and *Bonner* involved cases in which non-sample pages were not re-processed, the principle applies equally here where the operative *Vaughn* index is based on the error-riddled sample. Even though the FBI reprocessed the remaining pages, it rendered the sample unrepresentative by changing the treatment of the documents underlying the sample. A sample is drawn from a larger pool; here, the larger pool was changed after the sampling. Therefore, the sample is no longer representative of the underlying pool—even if the agency intended to treat the documents consistently.

Moreover, the FBI provides no justification for the changes in its claimed exemptions, either in the sample or non-sample documents. *Cf. Bonner* 928 F.2d at 1152–53. Therefore, whatever "consistency" the FBI claims exists between the sample and non-sample documents is unreviewable on the current administrative record. And the court has no information on whether

the documents were properly withheld initially and a change in circumstances occurred, as was the contention in *Bonner*, or whether the claimed exemptions were incorrect in the first place. For all these reasons, the court finds that the release of nearly two-thirds of the sampled documents casts "substantial doubt" on the propriety of the agency's withholdings.

The court will therefore deny without prejudice the parties' motions as they pertain to the merits of Defendant's claimed exemptions.  Given that the FBI's *Vaughn* index is no longer representative and lacks necessary detail regarding the documents withheld and released, the court finds that reviewing the agency's exemptions at this time would be premature and inefficient.  Instead, the court will remand this case to the FBI, which is instructed to provide adequate justification to Colgan regarding any withheld materials; the parties may agree to accomplish this through re-sampling the withheld materials for a *Vaughn* index.

## C. Remedy

Because the court finds that the FBI violated FOIA by failing to conduct adequate searches and to issue a representative *Vaughn* index, the court must fashion an appropriate remedy.  The D.C. Circuit has explained that agency FOIA responses are "informal adjudications" and that a court cannot "properly perform" a review of the adjudication "unless the agency has explained the reasons for its decision."  *Reliance Electric Co. v. Consumer Product Safety Comm'n*, 924 F.2d 274, 277 (D.C. Cir. 1991) (internal citations and quotations omitted).  Thus, an agency "must produce an administrative record that delineates the path by which it reached its decision. . . . When the agency has not done so, the proper course is to vacate and remand for an explanation."  *Id.*  Here, the court finds that because the FBI's searches and justifications for its searches were inadequate, as were its efforts at sampling and its *Vaughn* index, remand is the appropriate remedy.

## IV.    CONCLUSION

For the stated reasons, the court DENIES in part and GRANTS in part DOJ's motion for partial summary judgment and DENIES in part and GRANTS in part Plaintiff's cross-motion for summary judgment as to the adequacy of the searches.  The court further DENIES DOJ's motion for summary judgment and Colgan's cross-motion for summary judgment regarding DOJ's invocations of exemptions to withhold documents.  The court remands this case to the agency for further processing of this FOIA request consistent with FOIA and this opinion.

A corresponding Order will issue separately.


Date:  April 28, 2020



*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge